FRANK RIEDEL, Appellee, *vs.* THE CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY, Appellant.

*Opinion filed April 23, 1909.*

1. NEGLIGENCE—*what tends to show negligence in switching cars.* Evidence that a railroad company made a flying switch of cars into a passageway between buildings where persons were likely to be passing; that the cars were propelled at the rate of twelve or fifteen miles an hour; that the machinery in the buildings made much noise; that it was nearly dark in the passageway; that there was no light on the cars and no warning given except that a man on the approaching cars shouted, but that neither the approach of the cars nor the shouts were heard by the person injured, tends to show negligence by the railroad company in switching the cars.

2. SAME—*when the question of contributory negligence is not a matter of law.* Whether the plaintiff was guilty of contributory negligence is a question of fact and not of law, where the evidence tends to show that he had been at work "pinching" a car into position for loading on the west one of two parallel tracks; that as he turned to go north between the tracks he glanced south along the east track; that his view was somewhat obstructed but no approaching cars were within the range of his vision; that he had taken but a few steps when he was struck by a car being switched

from the south on the east track, and that while he was familiar with the method of daily switching employed he had never known it to be done so late and did not know it had not all been done. (*Belt Railway Co.* v. *Skszypczak*, 225 Ill. 242, distinguished.)

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of LaSalle county; the Hon. R. M. SKINNER, Judge, presiding.

This is an appeal by the Chicago, Rock Island and Pacific Railway Company from a judgment of the Appellate Court for the Second District affirming a judgment for $3500 recovered by Frank Riedel, appellee, against it in the circuit court of LaSalle county, in an action on the case for personal injuries alleged to have been sustained by him through the negligence of the appellant, by its servants, in switching certain cars at the German-American Portland Cement Works, near the city of LaSalle.

The declaration charged the appellant with negligence in switching a cut of cars over a switch track at a high and dangerous rate of speed, without any warning or notice to appellee of the approach of the same, as a result whereof appellee was struck and injured by one of the cars. The general issue was interposed.

The plant of the German-American Portland Cement Works, covering over three hundred acres of land, is located on the east side of the city of LaSalle, north of and adjacent to the main line of appellant. At this point the line, which is a double track, runs almost due east and west, the south track being used by east-bound trains and the north track by those running west. A short distance east of the cement works a switch owned by appellant leaves the north track and runs into the plant of the cement company. For a distance of about 370 feet it curves to the north and west, when it becomes a double track, which continues north for about 500 feet, passing between the store-

house of the cement works on the west and the engine house on the east. The distance between those two buildings is 25.7 feet and they are built nearly opposite each other. The storehouse is 180 feet in length and 40 feet high. The engine house is 145 feet in length and 35 feet high. The two tracks running between the engine house and the storehouse were of standard gauge and were laid seven feet apart. After passing the storehouse the west switch ends about 300 feet north of that building. This track was called the "house track," and was devoted entirely to loading cars with cement. The east switch track was known as the "coal track," and was used for the purpose of supplying the plant with coal. That track continues north past the engine house for about 150 feet and then curves off to the north-east, running past a shed where the slack used in the crusher was unloaded. Cars could be pushed along this track to a point where they could not be seen by a man on the ground between the storehouse and the engine house on account of intervening buildings. For a distance of 200 feet after leaving the main line the switch is laid on a down-grade. From this point to the north end of the storehouse the track is comparatively level and from there on the grade rises slightly. The cement is manufactured in buildings located on the east side of the switch tracks and is conveyed from there over the tracks, by a conveyor, to the storehouse, from which it is loaded into cars. That conveyor is 40 feet above the tracks and has a cover six or seven feet wide. When the plant is in operation the machinery makes a great deal of noise.

Appellant, under a contract with the cement company, did the switching at the plant. This work was usually done between two and five o'clock P. M. each day by a switch crew which came from LaSalle for that purpose. In doing the work their plan of operation was usually as follows: Before leaving the city of LaSalle the train of cars destined for the cement works would be made up with empty box-

cars at the east end of the train, then cars loaded with egg coal for the engine house, and then followed cars loaded with slack for the crusher. The engine was placed at the rear end and the train pushed eastward from the city until it passed the cement works, where it crossed over on the west-bound track. The engine was then uncoupled from the train, which was left in charge of a flagman. The engine then passed over the switch into the factory grounds to pull out the empty coal cars and the cars loaded with cement. Ordinarily the cars on the house track were pulled out first and then those on the coal track. When the cars had thus been removed from both of the tracks the engine would be coupled to the west end of the train intended for the works and the train would be given sufficient momentum to carry it into the works by the use of a flying switch, the cars containing the slack being on the end of the train which came first. The engine having been cut off would then follow the train in on the coal track and leave the slack at the coal shed, bring the cars loaded with egg coal back to the engine room and then place the empty box-cars on the house track. When the flying switch was made it was the custom of the switching crew to place one of their men on the head car. Their work at the plant each afternoon usually occupied about an hour and a half.

Appellee, who was an employee of the cement company engaged as a packer in the storehouse, was struck and injured by one of the cars between 5 and 5:30 o'clock during the afternoon of October 27, while the switching was being done. It was a cloudy, lowering evening, and it seems that the cement dust in the air made it somewhat darker in the passageway between the engine house and the storehouse at this time than it otherwise would have been. There was yet, however, sufficient light to enable the switchmen and those employed around the plant to perform their work without the use of artificial light. Some minutes prior to the time of the accident loaded cars on the house track, and

certain empty cars on that track which had been put there on a previous day, had been removed from that track by the switch engine and the same empty cars had then been returned to that track. The cars from the coal track were then pulled out. Shortly thereafter the appellee and several other packers came out of the storehouse and began placing those empty cars opposite the doors of the storehouse ready for loading. Before beginning this work appellee looked along the coal track and saw that it was clear. Nothing could be seen or heard of the engine. He was using a crowbar, working at the north-east corner of a car that was being pushed south to the south door of the storehouse, and while so engaged worked with one foot on either side of the east rail of the house track. When the car was "spotted" at the south door appellee turned to his left and started north with the other men to move the next car to the south. Just as he was turning to go north, appellee, according to his own statement, looked to the south along the coal track past the north-east corner of the car which they had been moving, for a distance of five or six feet, which was as far as he could see to the south at that moment because the corner of the car which he had been helping to move obstructed his view. He then walked north between the two tracks. Just at this time the cars were being switched in over the coal track, and after he had walked north a few feet he was struck on the right side of his back by the north-west corner of the first car and seriously injured. At the time he looked to the south after moving the car, none of the approaching cars were within the range of his vision.

When the accident occurred, John Trevillian, the foreman of the switching crew, was standing on the top of the slack, about the center of the front car. Trevillian testified that when the cars were yet 75 or 80 feet away from appellee he saw the latter at work helping to move the box-car; that, fearing lest he and the men at work with him, on account of the noise of the machinery, might not hear the ap-

proaching train and might step over upon the coal track in front of it, he shouted to them. No warning of the coming of the cars was given to the men other than the shouts of Trevillian. The cement plant was then in operation, and it appears from the evidence that these shouts were not heard by appellee, and it is doubtful whether they were heard by any of the men working with him. These men knew, however, the method employed by the crew in switching the cars and knew that no cars loaded with coal had yet been left at the engine house.

It is contended by appellant that the court erred in refusing to direct a verdict in its favor, because (1) there is no evidence tending to show that it was guilty of the negligence charged; (2) there is no evidence tending to show that appellee was in the exercise of due care; and (3) upon the undisputed evidence all reasonable minds will agree that appellee was guilty of negligence which contributed to the injury.

WILLIAM D. FULLERTON, (BENJAMIN S. CABLE, of counsel,) for appellant.

COLEMAN & COLEMAN, and DUNCAN, DOYLE & O'CONOR, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

There is evidence in this record which indicates the following: Appellant, by a flying switch, propelled a cut of cars into the passageway between the buildings at a rate of twelve or fifteen miles per hour. It was then dusk and well nigh dark in that passageway. The cement mill was in operation, and its noise was such that the rumble of the approaching cars could not be heard. There was no light on the cars. No warning was given, except that a man on the first car shouted when he saw that the car was apt to strike persons in the passageway, and it is not clear that the

shouts were loud enough to be heard by any of those persons. Appellee did not hear them. There was no flagman or other employee of appellant in the passageway to give notice of the approach of the train. Persons were apt to pass and re-pass in that passageway at that hour, as appellant knew. This proof tends to show that appellant was guilty of the negligence charged by the declaration.

Appellee had been "baring" a freight car to the south,— the direction from which the flying cars came,—on a track parallel to that over which those cars approached. When the car that he was so pushing reached the place at which he left it, he was a little north of the north-east corner thereof, with his face toward the car and to the south. The other track was to the east of him. He turned around to his left, which was to the east, and proceeded north between the two tracks. Just as he turned he glanced to the south, but not then being far enough east to see straight south past the car which he had been pushing, the farthest range of his vision to the south was on a line extending diagonally across the east track, five or six feet farther south, where it crossed that track, than the north end of that car. After he had started north he had taken but two or three steps when he was struck by that portion of the first of the cars moving north on the east track which projected west over the west rail of that track.

It is earnestly insisted that appellee knew the method followed in handling cars on those tracks and should have been expecting these cars to be moved into that passageway in the manner in which they were moved, and that, such being the case, ordinary care required the exercise of greater precautions than he made use of to ascertain whether a train was approaching when he turned and started to the north. As the switching was ordinarily done, when the work of the switch crew was completed there would have been loaded cars of coal standing on the east track opposite the space on the west track along which appellee helped to push the car,

for the use of the furnace room in the engine house on the east side of the tracks, and as appellee testified that before he started to assist in pushing the car he looked along the east track and could see nothing thereon, it is urged that he therefore should have expected the coming of the cars which inflicted the injury. Against this it is to be remembered that the appellee testified that he had never before known switching to be done in the yards at so late an hour. Under these circumstances, if appellee had reasoned on the subject at all, when he looked along the east track before beginning the work of moving the car to the south he might well have thought that the switching had been abandoned for the day and the cars of coal for the furnace room had not been brought in, or that those cars had been pushed along the east track and left at a point on that track beyond its turn to the east, where he could not see them from his position in the passageway on account of intervening buildings.

It is said by appellant that the case of *Belt Railway Co.* v. *Skszypczak,* 225 Ill. 242, is in point. In that case Skszypczak was on the railroad track engaged in tightening and replacing bolts in the rails. He was facing to the south. The train that injured him came from the south. He testified that he had not looked in that direction for ten minutes before he was struck. He was injured by a train that approached him from in front and he had not recently looked that way. Riedel was injured by a car which approached him from behind and he had looked in that direction but a few moments before, although the range of his vision had been greatly limited by the freight car which stood on the track that paralleled that upon which the cars approached him. Not perceiving the train coming from that direction, which was south, he turned, and was proceeding north, intent upon his work, when he was struck by the train coming from the south. We think the distinction obvious.

239—24

In the case at bar there was evidence which tended to prove that appellee was in the exercise of due care for his personal safety, and it cannot be said upon this record that the question of contributory negligence is one of law.

No question has been raised with reference to the character of the duty which appellant owed to appellee.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*